UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

BRANCH TOWERS, LLC, and T-MOBILE    )
SOUTH, LLC,                          )
                                     )
        Plaintiffs/Petitioners,      )
                                     )
v.                                   )    No. 3:15-cv-00487
                                     )    Judge Phillips
THE CITY OF KNOXVILLE, TENNESSEE     )
and THE CITY COUNCIL OF THE CITY OF  )
KNOXVILLE, TENNESSEE consisting of   )
FINBARR SAUNDERS, DUANE GRIEVE,      )
MARSHALL STAIR, NICK DELLA VOLPE,    )
NICK PAVLIS, DANIEL BROWN, BRENDA    )
PALMER, GEORGE WALLACE               )
and MARK CAMPEN,                     )
                                     )
        Defendants/Respondents.      )

## MEMORANDUM OPINION

Plaintiffs Branch Towers, LLC and T-Mobile South, LLC filed this civil action

against the City of Knoxville, Tennessee, the City Council of the City of Knoxville,

Tennessee, and each of its members (collectively "the City"). Plaintiffs applied to the

Knoxville/Knox County Metropolitan Planning Commission ("MPC") to install a

wireless telecommunications tower on 2119 Ridgecrest Drive in Knoxville. MPC

approved the application and a group of citizens appealed that decision to the City.

Plaintiffs now seek a declaratory judgment that the City's reversal of MPC's decision and

denial of the plaintiffs' application was a violation of two provisions of the federal

Telecommunications Act, 47 U.S.C. § 332(c)(7)(B), and Tennessee law. Plaintiffs have

filed a motion for summary judgment and supporting memorandum [Docs. 27, 28], the

defendants have responded in opposition [Doc. 39], and the plaintiffs have replied [Doc. 43]. The Court has also received an amicus curiae brief [Doc. 38] from numerous citizens from the Top of the Ridge Neighborhood Watch.

After carefully reviewing the motion and related pleadings and the administrative record [Doc. 22], the plaintiffs' motion for summary judgment [Doc. 27] will be **GRANTED** for the reasons set forth herein.

## I. Relevant Facts

Plaintiff T-Mobile South, LLC provides wireless telecommunications services in the Knoxville, Tennessee area through a network of interrelated and overlapping "cell sites" [R. at 375].[1] Plaintiff Branch Towers, LLC, constructs telecommunications towers that allow wireless carriers, such as T-Mobile, to create and maintain their network of digital cell sites [R. at 314].

T-Mobile's radio frequency ("RF") engineers identified a "significant gap" in its service in an approximately 1.5 square mile area in the Fountain City area of Knoxville [R. at 375]. The topography of the area consists of hilly terrain, rising from the southeast to the northwest, with dense foliage from mature trees ranging between 70 and 100 feet in height [*Id.*]. There are several residential streets, churches, a school, and several heavily traveled roads located in the service gap [*Id.*]. To meet the needs of its customers and to maintain competitiveness, T-Mobile requires indoor residential coverage levels in the gap

---

[1]The administrative record is filed in the record as Doc. 22-1 and will be cited as "R. at ___." Pincites refer to the electronic page numbers.

2

area [*Id*.]. To remedy this gap in service, T-Mobile asked Branch Towers to develop a wireless communications facility within the area [R. at 86].

The plaintiffs ultimately identified property at 2119 Ridgecrest Drive ("the proposed facility") as suitable for construction of a wireless facility that was capable of meeting the local zoning requirements, and had a landlord willing to lease sufficient space to construct and maintain a wireless facility on her property [R. at 216—17]. The property is zoned R-1, low density residential [R. at 8].

Prior to their application to MPC and during the application and appeal process, the plaintiffs considered several potential alternative locations for the tower, including four existing structures [R. at 377]. A stealth tower at 6242 Grove Drive would be less intrusive than the proposed facility, but was not tall enough to provide the radio frequency coverage necessary to fill the coverage gap [*Id*. at 377, 404]. Similarly, a water tank at 2935 Walkup Drive would be less intrusive than the proposed facility, but was not tall enough to provide the radio frequency coverage necessary to fill the service gap [*Id*. at 377, 403]. A U.S. Cellular tower at 815 Oaklett Road would be less intrusive than the proposed facility, but was determined to be located too far west and would not cover the target area [*Id*. at 377, 404]. A Tennessee Valley Authority tower at 6138 Winter Garden Way would be less intrusive than the proposed facility, but was determined to not cover the majority of the gap to the east [*Id*.]. Further, the Knoxville

Utilities Board, which owns the lines on this tower, discourages collocation[2] on its towers [*Id.*].

The plaintiffs also considered nine raw land sites and three were determined capable of providing sufficient radio frequency ("RF") coverage to cover the service gap. However, a tower at 500 Gresham Road, location of Gresham Middle School, would have to be 195 feet high, 45 feet higher than the proposed facility [*Id.* at 377, 405]. Further, the tower would have to be less than 200 feet from the school, there would be little screening or buffer, and over 100 homes would be impacted by a view of the tower [*Id.* at 405]. Finally, plaintiffs concluded that the site would have significant liability risks because the tower would be so close to a school [*Id.*]. Thus, it would not be less intrusive than the proposed facility.

A tower at the Snowood Drive property owned by Maurice Grigsby would not meet the setback requirements of the City's Zoning Ordinance [*Id.* at 377, 406]. Finally, a tower at 6024 Grove Drive, location of the Church of Jesus Christ of Latter Day Saints, would provide the necessary RF coverage but has "significantly less tree coverage and foliage to screen the site" [*Id.* at 377, 405]. Plaintiffs also concluded that this site would have more visual impact on the surrounding neighborhood because of the lack of buffering and the size of the parcel. Thus, it would not be less intrusive than the proposed facility [*Id.*].

---

[2]The Wireless Communications Facilities Plan, discussed *infra*, defines "co-location" as "[t]he placement of antennas for two or more carriers on the same tower or structure" [Doc. 39-2 at p. 8]. The term is also written as "colocation" in the plaintiffs' application to MPC [R. at 315] and sometimes in the case law. *See e.g., T-Mobile Central, LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 801 (6th Cir. 2012).

Pursuant to the City of Knoxville's Zoning Ordinance, commercial telecommunications towers are "uses permitted on review" for the R-1 zoning designation [Doc. 14-4 at p. 12]. The Zoning Ordinance describes "uses permitted on review" as "so classified because they more intensely dominate the area in which they are located than do other uses permitted in the district; however, the nature of such use makes it desirable that they be permitted to locate therein" [*Id*. at p. 3]. The Zoning Ordinance sets forth the following general standards to guide the MPC, along with other adopted plans and polices:

> 1.      The use is consistent with adopted plans and polices [*sic*], including the "General Plan" and the "One-Year Plan."
>
> 2.      The use [is] in harmony with the general purpose and intent of these zoning regulations.
>
> 3.      The use is compatible with the character of the neighborhood where it is proposed, and with the size and location of buildings in the vicinity.
>
> 4.      The use will not significantly injure the value of adjacent property or by noise, lights, fumes, odors, vibration, traffic, congestion or other impacts detract from the immediate environment.
>
> 5.      The use is not of a nature or so located as to draw substantial additional traffic through residential streets.
>
> 6.      The nature of development in the surrounding area is not such as to pose a potential hazard to the proposed use or to create an undesirable environment for the proposed use.

[Doc. 14-4 at p. 3]. The MPC review process is intended to provide for uses which are beneficial to the community but that may involve a potential hazard to the development of an area unless appropriate provisions are made for their impacts and to integrate properly the uses permitted on review with other uses located in the district [*Id*. at p. 18].

5

MPC may approve a use on review "where it can be shown that the proposed plan or use is in harmony with the general purpose and intent of the zoning ordinance and with the general plan and one-year plan and is reasonably necessary for the convenience and welfare of the community" [*Id.*].

In 2002, MPC adopted a "Wireless Communications Facilities Plan" ("Wireless Plan") to be used as a guide in making decisions on applications for approval of new telecommunications towers [Doc. 39-2 at p. 6]. Plaintiffs emphasize that the Wireless Plan states that its "guidelines are advisory and adherence to them is not a legal requirement" [*Id.* at p. 16]. The Wireless Plan further states that "[p]roposals that are in substantial compliance with the principles outlined below should be approved" [*Id.*]. Those principles are: (1) "[t]he proposed facility should not burden other properties with adverse visual impacts, nor should the facility detract from the character of the Knoxville-Knox County landscape"; and (2) "[t]he proposed facility should not interfere with the use and enjoyment of other properties and should be consistent with the character of land use and development of the area around its location" [*Id.*]. The Wireless Plan classifies three types of areas for the placement of telecommunications towers: opportunity areas, sensitive areas, and avoidance areas [*Id.*]. It is undisputed that the property at 2119 Ridgecrest Drive is considered both a "sensitive area," where placement of wireless communication facilities will most likely raise issues related to safety, property values, visibility, or land use compatibility, and an "avoidance area," where wireless communication towers should not be located [*see* R. at 10, 428; Doc. 39-2 at pp. 18, 20].

6

On March 27, 2015, Plaintiffs submitted an application to MPC to construct a 150 foot monopole[3] wireless tower on the property at 2119 Ridgecrest Road [R. at 312—321]. As described in the application, the tower will be constructed in the interior of a 5.75 acre, heavily wooded lot and will be connected to Ridgecrest Drive by a 16 foot wide paved road and utility easement [R. at 314—15]. The tower will be structurally capable of supporting collocation by at least three additional telecommunications providers [R. at 314—15]. The facility will have a 165-foot setback, which is equal to 110% of the height of the tower as required by the Wireless Plan [R. at 314, 417; *see* Doc. 39-2 at p. 14]. The materials submitted to MPC include an identification of some of the alternative sites considered, discussed *supra*, and the reasons why they were not deemed to be viable alternatives to the 2119 Ridgecrest Road property [R. at 47—49].

During the time the application was pending with MPC, the plaintiffs submitted several photographs of the proposed site from different angles, photo simulations of balloon tests to demonstrate how the site would look with the proposed tower, and various maps of the area which show the proposed site, existing towers, and T-Mobile's current coverage in the area [R. at 90—108, 423—425]. Also during the period of MPC's review, plaintiff representatives held two meetings with community members and reviewed seven alternative sites suggested by the residents [R. at 408, 427]. Plaintiffs also submitted the professional opinion of Harris B. Simpson, a real property appraiser,

---

[3]The Wireless Plan defines a monopole as "[a] cylindrical self-supporting communication tower constructed as a single spire" [Doc. 39-2 at p. 8]. It is worth noting that plaintiffs also suggested an alternate design of a monopole designed to look like a pine tree, also called a "stealth tower," but that MPC staff recommended against its use because it would look more out of place than a standard monopole [R. at 355].

who concluded that the proposed tower "will have no discernable negative impact on the values, marketability or the rates of appreciation of properties in the surrounding areas" [R. at 56—57].

MPC's consultant, Larry Perry, reviewed the plaintiffs' application and concluded that the application met all the requirements of the Zoning Ordinance with the exception of the landscaping requirement which the plaintiffs' agreed to provide [R. at 12—18].[4] Mr. Perry noted that the plaintiffs had "proven a need for the site for its coverage requirements to include the new 4G technology and the site is necessary to provide that coverage and to overcome the shadowing effect of surrounding hills and wooded areas" [R. at 12]. Further, Mr. Perry agreed that "there are no other alternate sites within a mile that are useable" [*Id.*]. Mr. Perry also opined that the addition of this tower "would probably eliminate the need for other sites nearby" [R. at 15].

MPC staff reviewed the application and Mr. Perry's report and recommended approval of the application as the "request meets all criteria for a use-on-review in the R-1 zoning district" [R. at 355]. Because the proposed facility would be in both a "sensitive area" and an "avoidance area" under the Wireless Facilities Plan, the MPC report noted that the Plan "discourages moderate monopole towers located within residential neighborhoods" [R. at 356]. However, "[b]ased on the documentation provided by the applicant and verified by the review conducted by the Planning Commission's consultant

_____

[4]Mr. Perry was retained by MPC, pursuant to the Zoning Ordinance, to "review and report" on the "technical engineering aspects" of the application. *See* City of Knoxville Zoning Regulations, Article V, Section 20(B)(1)(f). Unfortunately, the complete relevant zoning provisions are not contained in the record.

[Mr. Perry], it has been determined that there are no other alternate sites within a mile that are useable for providing the needed coverage" [*Id.*].

On August 13, 2015, MPC approved the plaintiffs' application at its public meeting by a vote of 8 to 5 [R. at 239]. It is worth noting that MPC received substantial opposition to the plaintiffs' application from the public via written comments, letters from local real estate brokers, online petitions, simulated photographs of the area, maps, information regarding the scenic Dogwood Trails in Knoxville, and articles regarding cell towers in neighborhoods [R. at 115—212]. Many of the comments expressed concerns regarding the placement of a communications tower in a residential neighborhood and the impact this tower would have on the property values and view aesthetics of the residents. Several residents of the neighborhood also spoke in opposition to the application at MPC's meeting [R. at 215—16, 218, 225].

Knoxville attorney John R. King, on behalf of several property owners and/or residents of property in the neighborhood, appealed MPC's decision to the Knoxville City Council on August 26, 2015 [R. at 4—7]. In support of their appeal, the residents submitted a report from the Center for Municipal Solutions ("CMS") containing their critique and evaluation of the plaintiffs' application, but concluded that CMS "could not make any definitive determinations with respect to the need for what is requested to the exclusion of any reasonable, technically viable alternatives" [R. at 242—66]. The CMS report suggested that the use of "small cells attached to utility and light poles" was "one probably technically viable less intrusive alternative" to the proposed facility [R. at 250]. In response, both Mr. Blewitt and Mr. Perry testified that the use of "small cell systems"

are not effective to remedy a large gap in service coverage [R. at 551, 556]. The neighborhood residents also submitted written and oral comments in opposition to the application at the hearing. The City Council considered the appeal at its September 30, 2015 meeting and voted 7 to 1 to approve the appeal, thus denying the plaintiffs' application [R. at 2—3]. This civil action followed.

## II.    Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.    Analysis

As outlined by the Supreme Court, Congress enacted the Telecommunications Act "to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new telecommunications technologies.'" *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005) (quoting 110 Stat. 56). In order to accomplish these goals, Congress sought to reduce the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers. *Id.* Thus, although the Act recognizes "the authority of a State or local government or instrumentality … over decisions regarding the placement, construction,

and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A), Congress included "specific limitations" on that authority. *City of Rancho Palos Verdes*, 544 U.S. at 115—16. Relevant to the pending motion are the provisions that local governments cannot take actions that "prohibit or have the effect of prohibiting the provision of personal wireless services," § 332(c)(7)(B)(i)(II), and that a denial of a request for authorization to locate a wireless facility must "be in writing and supported by substantial evidence contained in a written record," § 332(c)(7)(B)(iii).

<u>Whether the Denial Effectively Prohibits Wireless Service in Violation of Section 332(c)(7)(B)(i)(II)</u>

Plaintiffs argue that the denial of their application constitutes an effective prohibition of wireless service in violation of the Telecommunications Act. Section 332(c)(7)(B)(i)(II) of the Act provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Relying on *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794 (6th Cir. 2012), plaintiffs argue that they have demonstrated the existence of a significant gap in the service area and the proposed tower is the least intrusive means to remedy that gap [Doc. 28 at pp. 14—21].

In response, defendants emphasize that the Act preserves local government's authority in regulating the placement of cell towers, citing § 332(c)(7)(A) [Doc. 39-1 at pp. 16—17]. Defendants dispute whether the plaintiffs have demonstrated a significant

gap in coverage and whether plaintiffs have established that there are "no alternative sites" [*Id*. at pp. 17—20].

The Sixth Circuit adopted a two-part test to evaluate whether the denial of an application amounts to an "effective prohibition" claim: (1) there must be a showing of a significant gap in service coverage; and (2) some inquiry into the feasibility of alternative facilities or site locations. *W. Bloomfield*, 691 F.3d at 805. The Sixth Circuit further explained that the "significant gap" refers to a gap in the carrier's own service and that there is no requirement that actual customer complaints need to be submitted to demonstrate a coverage gap. *Id.* at 807. It is well settled that this Court's review of whether the denial of the plaintiffs' application constitutes an effective prohibition of wireless service is a legal determination made without deference to the local zoning authority. *See AT&T Mobility Servs., LLC v. Village of Corrales*, No. 15-2069, 2016 WL 873398, at *1 (10th Cir. Mar. 8, 2016); *T-Mobile Ne. LLC v. Loudoun Cty. Bd. of Supervisors*, 748 F.3d 185, 192 (4th Cir. 2014); *VoiceStream Minn., Inc. v. St. Croix Cty.*, 342 F.3d 818, 833 (7th Cir. 2003); *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002).

1.    Whether There is a Significant Gap in Coverage

Plaintiffs contend that they have provided sufficient evidence of a significant gap in coverage by submission of propagation maps and a description of the coverage gap by T-Mobile's RF Engineer, Kevin Blewitt [R. at 90—91, 550—51], which are the types of evidence that the Sixth Circuit found to be suitable in *West Bloomfield* to support a claim for a substantial gap in coverage [Doc. 28 at p. 9]. Plaintiffs also note that MPC's

13

consultant, Mr. Perry, confirmed that there was a gap in coverage [R. at 362 ("there is very little signal coverage in the area")] and a need for the site [R. at 12 ("[t]he applicant has proven a need for the site for its coverage requirements to include the new 4G technology and the site is necessary to provide that coverage and to overcome the shadowing effect of surrounding hills and wooded areas")] [*Id.*].[5]

The City suggests that there are questions of fact as to whether T-Mobile has demonstrated a gap in coverage based on T-Mobile's marketing claims of "4G LTE blanketing this whole area" per City Councilmember Mark Campen [R. at 560; Doc. 39-1 at pp. 19—20]. Similarly, the amicus brief suggests that the "services" which T-Mobile seeks to provide go far beyond the type of services covered by the Telecommunications Act such as merely connecting to telephone landlines [Doc. 38 at pp. 20—21]. Further, the amicus brief notes that the T-Mobile website shows a "fair signal" in the area to be served by the proposed tower [*Id.* at p. 21].

As plaintiffs have pointed out in reply [Doc. 43 at pp. 7—13] and as explained in the plaintiffs' appeal to City Council [R. at 414], the propogation maps submitted with T-Mobile's application show the level of signal coverage in the area, whereas the marketing

---

[5]The City suggests that Mr. Perry's report exceeded the scope of his authority because he reviewed plaintiffs' application "for technical and Federal/State legal compliance" as opposed to just "technical engineering aspects" as set forth in the Zoning Ordinance § 20(b)(1)(f) and that he "is not a lawyer or land use planner" [Doc. 39-1 at p. 20]. This argument is without merit. As set forth in plaintiffs' reply and Mr. Perry's supporting declaration [Doc. 43-1], Mr. Perry has both law and engineering degrees and has extensive experience in preparing and reviewing applications for communications towers. Members of both MPC and City Council praised Mr. Perry's qualifications [*see* R. at 224, 554, 559]. The City did not include his qualifications, attached to his report, in the administrative record. Further, Mr. Perry's report specifies that he reviewed the application in light of "FAA lighting and marking requirements and proposals" and "FCC requirements regarding signal coverage, towers and lighting" [R. at 14], points which are surely both "technical engineering" concerns and "federal/state legal compliance."

map on T-Mobile's website shows the kind of technology available in the area, *i.e.*, 4G, 3G, etc.[6] *See* R. at 41 ("[t]his map does not show the level of coverage that you get with a 4G phone; it just means that if you buy a T-Mobile Phone to use in this area, 4G technology will be available"). T-Mobile also asserts that the "coverage check" on its website, which is not contained in the record, shows outdoor coverage and not necessarily indoor coverage. Similarly, the "fair signal" designation on its website[7] is defined as "cell reception outdoors and occasionally indoors" and is the weakest designation of the 4G LTE signals [Doc. 43 at pp. 8—9]. Plaintiffs have cited numerous decisions from other district courts finding that a lack of "in-building" coverage is the standard for determining whether a significant coverage gap exists [Doc. 43 at p. 8]. *See, e.g., T-Mobile W. Corp. v. City of Huntington Beach*, No. CV 10-2835 CAS, 2012 WL 4867775, at *17 (C.D. Cal. Oct. 10, 2012); *T-Mobile W. Corp. v. City of Agoura Hills*, No. CV 09-9077 DSF, 2010 WL 5313398, at *8 (C.D. Cal. Dec. 20, 2010); *MetroPCS New York, LLC v. Village of East Hills*, 764 F. Supp. 2d 441, 453 (E.D.N.Y. 2011); *T-Mobile Cent., LLC v. Wyandotte Cty.*, 528 F. Supp. 2d 1128, 1169 (D. Kan. 2007). Thus, the evidence of the type of available technology in the area does not create an issue of fact as to the level of coverage.

---

[6]Mr. Perry's report states that there are "no other towers in the area that can provide the coverage need for the service to the area. The coverage is based on the new technology currently being touted by the various carriers, 4G, for data and voice transmission" [R. at p. 16].

[7]The amicus petitioners have filed a copy of T-Mobile's coverage map as of the filing of their brief (April 21, 2016) which shows that the area around and including Ridgecrest Drive has a "fair signal" [Doc. 38-2]. The definition for "fair signal" is contained in the plaintiffs' reply brief [Doc. 43 at p. 8].

15

The need for this coverage was also explained in the MPC report. "With the introduction of the smart phone and the sharing of data by phone, and with an increasing number of people replacing land line service with cellular service, there is now a greater demand for service in the residential neighborhoods. This change in the use of cell phones has increased the need for finding suitable sites for telecommunication towers in the residential areas" [R. at p. 10].

The Court finds that plaintiffs have demonstrated a significant gap in service coverage through the propogation maps, the opinion of T-Mobile's engineer, Mr. Blewitt, and MPC's own consultant, Mr. Perry. As Mr. Perry notes, "there is very little signal coverage in the area … [and] the addition of a cell site here … would probably eliminate the need for other sites nearby" [R. at p. 15]. Neither the City nor the amicus petitioners have submitted evidence to contradict the evidence supplied by the plaintiffs.[8] Because the uncontradicted evidence demonstrates that the proposed facility would ameliorate a current significant gap in T-Mobile service, plaintiffs have met their burden as to the first prong of an "effective prohibition" claim.

_____

[8] The record contains a few written comments from members of the public to MPC questioning the need for the proposed facility, but they provided no evidence to contradict the existence of the coverage gap. *See* R. at 134 ("I don't know of anyone around here who is having difficulty with telecommunication service"), and 149 ("neighborhood residents will receive no direct benefit from the tower, whose signal will radiate outward to distant communities"). As previously noted, "there is no requirement … that actual customer complaints need to be submitted to demonstrate a coverage gap." *W. Bloomfield*, 691 F.3d at 807; *see Cellular South Real Estate, Inc. v. City of Germantown*, No. 2:12-cv-02888-JPM-tmp, 2015 WL 3852781, at *9 (W.D. Tenn. June 22, 2015) ("[t]he relevant inquiry is whether there is a significant gap in the particular provider's coverage that would be ameliorated by the addition of a new telecommunications tower"); *American Towers, Inc. v. Wilson Cty.*, No. 3:10-cv-1196, 2014 WL 28953, at *11 (M.D. Tenn. Jan. 2, 2014 ("[a] single opponent's lay opinion about coverage quality does not upend the conclusion that ATI showed a significant coverage gap").

2.    <u>Whether the Proposed Facility is the Least Intrusive Means to Remedy the Gap</u>

As noted above, the second prong of an effective denial of service claim is "some inquiry into the feasibility of alternative facilities or site locations." *W. Bloomfield*, 691 F.3d at 805. Thus, the plaintiffs must make some showing as to the intrusiveness or necessity of its proposed means of closing the coverage gap. *Id*. at 808. Contrary to the City's assertion, the Sixth Circuit has adopted the test used by the Second, Third, and Ninth Circuits, that is, that the manner in which plaintiffs propose to fill the significant gap in service is "the least intrusive on the values that the denial sought to serve." *Id*. (quoting *APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler Cty. of Pa.*, 196 F.3d 469, 480 (3rd Cir. 1999)).[9] Under the "straightforward" analysis of the "least intrusive" test, the plaintiffs must show "that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc." *Id*. (quoting *Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 331 F.3d 386, 398 (3rd Cir. 2003)). The applicant is not required to "search for alternatives indefinitely." *Id*.; *see American Towers, Inc. v. Wilson Cty.*, 2014 WL 28953, at *12 (M.D. Tenn. Jan. 2, 2104) (plaintiff "was not required to turn every stone

---

[9]The City suggests that this part of the test requires the provider to show that there are "no alternative sites that would solve the problem" [Doc. 39-1 at p. 17 (citing *VoiceStream Minneapolis, Inc. v. St. Croix Cty.*, 342 F.3d 818, 834 (7th Cir. 2003))]. However, the *West Bloomfield* court specifically considered the test used by the First and Seventh Circuits as outlined in *St. Croix* and rejected it in favor of the "least intrusive" standard. *See W. Bloomfield*, 691 F.3d at 808 ("We … adopt the "least intrusive" standard from the Second, Third, and Ninth Circuits. It is considerably more flexible than the "no viable alternatives" standard, as a carrier could endlessly have to search for different, marginally better alternatives."). Accordingly, the "least intrusive standard" is the standard this Court is bound to follow.

17

in its search for a viable location [and] the fact that it didn't do so is immaterial to Wilson County's legal argument").

Plaintiffs contend and the record reflects that they considered over a dozen alternatives, including existing structures, raw land alternatives, and all of the alternative sites suggested by neighborhood residents [Doc. 28 at pp. 18—19; R. at 377, 403—407]. However, T-Mobile concluded there were no existing structures suitable for collocation and none of the raw land sites were technically feasible, actually available, or less intrusive than the proposed facility [*Id.*]. Similarly, as noted by plaintiffs' attorney, Ms. Miller, in correspondence to MPC, plaintiffs "held two community meetings and reviewed seven alternative sites which residents suggested. Those sites do not present viable alternatives" [R. at p. 41].

The City's response is a bit of a moving target. First, the City argues that the plaintiffs have presented varying reasons for why alternative sites were not considered viable. Second, the City suggests that three of the rejected sites could be viable if the plaintiffs had applied for variances under the Zoning Regulations. Third, the City takes issue with the balloon test and photo simulations presented by plaintiffs as not accurate.[10] Finally, the City contends that the plaintiffs were "unclear" as to how many alternative

---

[10]This argument is without merit. The record reflects that the plaintiffs explained the methodology for the balloon simulation photographs on several occasions [*see* R. at 414 ("[t]he dense wooding and foliage prevented Branch from raising the balloon at the exact site of the proposed tower. …Branch increased the height of the balloon to 210 feet to accommodate for the differences in location and for the impact of possible wind gusts"), 451—52]. Moreover, the City acknowledges that the neighborhood opposition provided "no independent verification of the accuracy" of the photo simulations they submitted [Doc. 39-2 at p. 19].

18

sites were considered and that plaintiffs presented only conclusory statements, rather than proof, that the alternatives were not feasible [Doc. 39-1 at pp. 18—19].

Although defendants "respectfully submit there are other feasible plans and there are other solutions to the purported problem" [Doc. 39-1 at p. 19], they do not specify what those other plans or solutions might be. The MPC report notes that "[b]ased on the documentation provided by the applicant and verified by the review conducted by the Planning Commission's consultant, it has been determined that there are no other alternate sites within a mile that are useable for providing the needed coverage" [R. at pp. 10, 12]. The materials submitted to MPC contain a list of seven alternative site evaluations and the reasons why those sites were deemed unsuitable [R. at pp. 47—49]. The materials submitted to City Council include Mr. Blewitt's declaration and a description of four existing structures which were considered for collocation and nine raw land sites which were considered and the reasons why these alternatives were not viable alternatives [R. at pp. 376—77]. Similarly, the declaration of Ms. Kramer, also submitted to City Council, contained a description of the alternatives considered by Branch Towers and the reasons why these alternatives were not viable alternatives [R. at pp. 403—407]. The record reflects that the plaintiffs considered new alternatives as they were presented throughout this process. Thus, it is unsurprising that the number of sites reviewed increased over time. Further, as the plaintiffs note, prospective sites may be eliminated as viable alternatives if they do not comply with the local zoning requirements, *i.e.*, a variance would be required. *See Indus. Tower & Wireless, LLC v. Haddad*, 109 F. Supp. 3d 284, 302 (D. Mass. 2015); *City of Huntington Beach*, 2012 WL

19

4867775, at *18; *City of Agoura Hills*, 2010 WL 5313398, at *9, *12. Finally, the record reflects that the plaintiffs proposed and MPC considered alternative designs and placement of antennae arrays, but that those were ultimately rejected [R. at 9, 36—37].

The City's speculative and unsupported assertion that other, feasible alternatives exist is insufficient to refute the plaintiffs' showing that there are no less intrusive alternatives to the proposed facility. *See T-Mobile Cent. LLC v. Charter Twp. of W. Bloomfield*, 2011 WL 1299357, at *5 (E.D. Mich. Mar. 31, 2011) (once the provider has made a showing of consideration of alternatives, "the burden shifts to the locality to show that there are some potentially available and technologically feasible alternatives") (quoting *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 998 (9th Cir. 2009)). The record reflect that the plaintiffs have considered less sensitive sites, alternative system designs, alternative tower designs, and placement of antennae on existing structures. Because plaintiffs have met their burden as to both of the *West Bloomfield* prongs, the Court finds that the City's decision had "the effect of prohibiting the provision of personal wireless services" in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) and plaintiffs are entitled to judgment as a matter of law on this claim. Having reached this conclusion, the Court declines to address whether the decision is supported by substantial evidence or whether it violated state law. *See T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 999 (9th Cir. 2009); *Skyway Towers, LLC v. Lexington-Fayette Urban Cty. Gov't*, No. 5:15-301-KKC, 2016 WL 817133, at *7 (E.D. Ky. Feb. 29, 2016).

## IV.    Conclusion

For the reasons set forth herein, the Court finds that plaintiffs' motion for summary judgment [Doc. 27] should be **GRANTED**.  In light of the Court's conclusion that the City's denial of plaintiffs' application is a violation of the "effective prohibition" provision of the Telecommunications Act, the appropriate remedy is injunctive relief compelling the City to approve the plaintiffs' application and issue the appropriate permits requested therein.  *See Wilson Cty.*, 2014 WL 28953, at * 14.  An appropriate order will be entered.

    s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE